## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GERARD LAFFAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SOVEREIGN BANK, N.A., AMERICAN MODERN INSURANCE GROUP, INC., and ATLAS INSURANCE AGENCY, INC.,<br><br>Defendants. | Civil Action No. _____<br><br><br>**COMPLAINT – CLASS ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      This is a proposed class action brought by Gerard Laffan ("Laffan") on behalf of all persons who have or had a residential mortgage loan or line of credit originated and/or serviced by Sovereign Bank, N.A. ("Sovereign") and, in connection therewith were required to pay for lender-placed or "force-placed" hazard insurance policies provided by American Modern Insurance Group, Inc. ("American Modern") and Atlas Insurance Agency, Inc. ("Atlas") (together, "AMIG") (collectively, "Defendants").   The allegations herein are based upon personal knowledge as to matters concerning Plaintiff and his own acts, and upon information and belief as to all other matters. The allegations that are not based on Plaintiff's personal knowledge result from investigation by Plaintiff's counsel.

2.      In this action, Plaintiff challenges, as further described herein, Sovereign's practice of purchasing force-placed hazard insurance from AMIG and its affiliates, pursuant to agreements that return a financial benefit to Sovereign or its affiliates that is unrelated to any contractual or other *bona fide* interest in protecting the lender's interest in the loan, and which

1

results in unauthorized, unjustified and unfairly inflated costs to the borrower for force-placed hazard insurance in violation of law.

3.     Defendants acted together to exploit Sovereign's ability to force-place insurance to reap additional, unjustified profits in the form of fees, commissions, rebates and other forms of consideration at the expense of borrowers whose hazard insurance was force-placed.  These fees and charges were not legitimately related to the cost of the force-placed insurance or to the purposes for which force-placed insurance is purchased – to protect the lender's interest in the property.

4.     As a condition to funding a borrower's loan, Sovereign requires that borrowers purchase and agree to maintain hazard insurance coverage on the secured property.  Plaintiff was required to obtain and maintain hazard insurance as a condition of his mortgage.  *See, e.g*., Deed of Trust ("Gerard Laffan Mortgage") attached as Exhibit 1.

5.     When borrowers failed to maintain their hazard insurance policies, Defendants replaced those policies with more expensive policies, known as "force-placed" or "lender-placed" insurance policies ("FPI" or "LPI" respectively).  On information and belief, AMIG has entered into an agreement that establishes that AMIG provides these policies to Sovereign pursuant to an exclusive contract.  Indeed, after Mr. Laffan's hazard insurance was force-placed, he was specifically informed by a Sovereign representative that:  "Sovereign has 150,000 first residential mortgages across the United States.  We do not shop around.  One company is chosen to perform the [force-placed hazard insurance] service."

6.     Sovereign forces the borrowers to pay for the force-placed policies by diverting the monthly mortgage payments and/or debiting the borrowers' escrow accounts.

2

7. Such policies almost always provide less coverage and are substantially more costly than the borrowers' original policies, with the additional expense being directly related to perverse incentives and lucrative financial benefits that are shared between Sovereign and AMIG.

8. In some instances borrowers are charged retroactively for coverage before the borrower is notified of the force-placement of the coverage.

9. Further, such policies often provide unnecessary or duplicative coverage, because they are improperly backdated to collect premiums for time periods during which the mortgagor has absolutely no risk of loss.

10. In addition, the premiums paid by and/or assessed to Plaintiff and Members of the Classes also included amounts not attributable to the cost of providing force-placed insurance but, instead, constituted expenses associated with servicing all the loans serviced by Sovereign. For example, while loan servicers are compensated for tracking and monitoring loan portfolios as part of their servicing agreements, many servicers have outsourced such portfolio monitoring and tracking services to force-placed insurance providers, such as AMIG, at below market rates – effectively providing kickbacks to Sovereign in the form of subsidies paid by force-placed borrowers. The small percentage of borrowers who paid for force-placed insurance thus shouldered the costs of monitoring Sovereign's entire loan portfolio. *See* Testimony of Birny Birnbaum of Behalf of the Center for Economic Justice for the Florida Office of Insurance Regulation (July 3, 2012), attached as Exhibit 2 ("Birnbaum Florida Testimony").

11. Borrowers have no say in the selection of the carrier or terms of the force-placed insurance policies. Borrowers also have no opportunity to comparison-shop for force-placed insurance policies. The terms and conditions of the insurance policy, as well as the cost of the

3

policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer. *See* Testimony of J. Robert Hunter, of the Consumer Federation of America dated May 17, 2012 at 10 ("Hunter NYDFS Testimony") attached as Exhibit 3.

12. For their part, servicers like Sovereign have no incentive to shop for the best rate. Rather, servicers are financially motivated to refer borrowers to the provider that offers the best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums that are established as part of the secret arrangements between providers and affiliates. Further, because the servicer's "commission" and/or reinsurance premium is directly tied to the size of the policy, the servicer actually has an incentive to purchase the highest priced insurance, an interest diametrically opposed to that of the borrower who is being charged for the insurance. *See, e.g*., Hunter NYDFS Testimony at 1.

13. As noted by Birny Birnbaum

> [t]he incentives and potential for abuse in the administration of LPI are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI [lender placed insurance] is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage."

*See* July 28, 2011 Testimony of Birny Birnbaum, Executive Director of the Center for Economic Justice, Before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services, attached as Exhibit 4.

14. Servicers often go so far as to actually outsource their insurance processing to the force-placed insurance provider. The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property. In the

event that the insurance provider determines that a borrower has not maintained adequate insurance coverage, the insurer automatically issues an insurance certificate on the property on behalf of and for the benefit of the servicer.  Thus, where these servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral. *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker (Nov. 10, 2010, 12:00 pm), http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html (referred to herein as "Ties to Insurers") (last visited July 9, 2013).

15.     The web of relationships among the Defendants and the arrangements between them served to funnel profits to Sovereign, AMIG and subsidiaries and affiliates.

16.     As one journalist recently observed:

> In the pantheon of modern-day mortgage abuses, force-placed insurance hasn't attracted much attention. But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions. Policies are sometimes backdated to cover periods that have already passed.
>
> In essence, critics say, high-priced insurance policies cover a time when no events happened. And often, the mortgage company and the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business. But homeowners don't know that."

*See* Dave Lieber, *Everyone Profits Off Force-Placed Insurance, Except Homeowner*, Star-Telegram (Oct. 1, 2011) attached as Exhibit 5.

17.     These very practices have drawn the scrutiny of state and federal bodies charged with the oversight of force-placed insurance.  In October 2011, a number of mortgage servicers

and insurers received subpoenas from the New York Department of Financial Services ("NYDFS") with respect to lender-placed insurance activities dating back to September 2005.

18.     The NYDFS conducted hearings on May 17, 18 and 21, 2012 during which the force-placed insurance practices of Defendants, their affiliates, subsidiaries and bank partners were among the topics addressed by witnesses and in written testimony.  Superintendent Benjamin Lawsky noted in his opening statement that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums for force-placed insurance than regular homeowners insurance; 2) extraordinarily low loss ratios; 3) harm to distressed borrowers; 4) lack of competition in the market; 5) force-placed insurance has become a major profit center for both banks and insurers; and 6) "tight relationships between banks, their subsidiaries and insurers."  As Superintendent Lawsky summarized the net result of these practices:

> Take the form of large commissions being paid by insurers to the banks for what appears to be very little.  In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies.  Thus, the banks pay high premiums for coverage that is highly profitable and then those profits revert right back to the banks through reinsurance agreements.
>
> *          *          *          *
>
> In sum, when you combine [the] close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions….

Opening Statement of Benjamin M. Lawsky, Superintendent of NYDFS, May 17, 2012 attached as Exhibit 6.

19.     The NYDFS heard testimony from several force placed insurers, mortgage servicers and noted experts in the course of its force-placed insurance investigation. *See, e.g.*, Birnbaum NYDFS Testimony; Hunter NYDFS Testimony.

20.     As a result of its investigation, NYDFS found:

> that insurers and banks built a network of troubling relationships and payoffs that helped drive premiums sky high.  Those improper practices created significant conflicts of interest and saddled homeowners, taxpayers, and investors with millions of dollars in unfair and unnecessary costs.
>
> *       *       *
>
> Indeed, even though banks and servicers are the ones who choose which force-placed insurance policy to purchase, the high premiums are ultimately charged to homeowners, and, in the event of foreclosure …

*See* New York Department of Financial Services Press Release dated March 21, 2013 ("NYDFS March 21, 2013 Press Release") attached as Exhibit 7.

21.     The NYDFS investigation further found that these practices resulted in a market characterized by "reverse competition."  The insurers competed by offering servicers and lenders a share in the profits, rather than by offering lower prices.  *Id.*

22.     The National Association of Insurance Commissioners ("NAIC") is the standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia and five U.S. territories.  The NAIC establishes standards and best practices, conducts peer review, and coordinates regulatory oversight.  Pursuant to these duties, the NAIC also investigated the force-placed insurance industry and found these practices so troubling that it held its own public hearings on August 9, 2012.  *See* NAIC Promises Greater Focus on Force-Placed Insurance as CFPB Proposes Rules attached hereto as Exhibit 8.  The NAIC, like the NYDFS, found there to be enough troublesome information regarding the force-placed insurance industry and its associated practices to warrant its full attention.

23.     The NAIC includes a discussion of "reverse competition" and lender-placed insurance on its website:

> A key regulatory concern with the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and amounts, yet the consumer is obligated to pay the cost of coverage. Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lowest price for coverage since the cost is born by the borrower. Normally competitive forces tend to drive down costs for consumers. However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.

http://www.naic.org/cipr_topics/topic_lender_placed_insurance.htm (last visited July 9, 2013).

24.     As a result of the NYDFS investigation into force-placed insurance practices, the NYDFS entered into a Consent Order with American Modern pursuant to which American Modern agreed to make changes to several of the unlawful force-placed insurance practices alleged herein, pay a civil penalty of $1 million, reduce the rates charged to borrowers whose insurance was force-placed, and provide restitution of a portion of the force-placed premium which was paid.  *See, e.g.* Consent Order, In the Matter of American Modern Home Insurance Company and American Modern Insurance Group, Inc. at 7-18 ("NYDFS Consent Order") attached as Exhibit 9.

25.     Sovereign's unlawful actions include as described in further detail below, *inter alia:* (a) abuse of its authority to force-place hazard insurance to generate unjustified profits for itself which were not disclosed to borrowers whose insurance was force-placed; (b) electing to purchase higher-priced insurance policies from its exclusive force-placed insurance providers for their mutual benefit; (c) entering into pre-arranged agreements to acquire high priced, force-placed insurance from AMIG or their subsidiaries and/or affiliates thereby diminishing any benefit to be gained by borrowers through open market or competitive purchasing environment;

(d) entering into pre-arranged agreements designed to yield exorbitant force-placed insurance charges to class members in order to maximize its own profits without any regard whatsoever for competitive pricing to the detriment of borrowers; (e) backdating the force-placed insurance policies to charge for retroactive and unnecessary coverage; (f) giving and receiving "kickbacks" in the form of purported fees, payments, unearned commissions, "rebates" and/or other things of value from providers of force-placed insurance (including AMIG and its subsidiaries and affiliates) for the procurement of the force-placed policies; (g) improperly exploiting its ability to manage and gain access to escrow funds in breach of fiduciary obligations relating to the management of escrow funds in order to increase profits; (h) misrepresenting the reasons for the high cost of force-placed insurance to Plaintiff and Class members; and (i) omitting to inform Plaintiff and Class members that force-placed insurance practices did not only protect its interest in Plaintiff's and Class members' properties but also generated unwarranted profits for itself and fellow scheme members.   These actions constitute a pattern and scheme of exploitative profiteering and self-dealing engaged in by Sovereign and its Co-Defendants, acting in concert, against the interests of Plaintiff and the Classes.

26.    Plaintiff asserts herein the following claims against Sovereign: (1) state/common law claims against Sovereign for  breach of its contractual obligations, including its implied covenant of good faith and fair dealing, owed to Plaintiff and the other Class members; (2) state/common law claims against Sovereign for  breach its fiduciary duties/misappropriation of escrow funds held and managed by Sovereign for the purpose of paying Escrow Items in accordance with the terms of Plaintiff's mortgages; and (3) claims for engaging in unconscionable, deceptive and/or fraudulent business practices in violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.*

27.     Defendant AMIG's unlawful actions include: (a) aiding and abetting Sovereign's breach of fiduciary duty pursuant to which they sold unconscionably high-priced, unnecessary and duplicative force-placed hazard insurance coverage and related services, including tracking Sovereign's loan portfolio and binding and obligating Plaintiff and Class members, through the improper utilization of access to escrow funds, to pay for the improper force-placed insurance to maximize Defendants' profits to the detriment of borrowers; (b) misrepresenting the reasons for the high cost of force-placed insurance; (c) failing to inform Plaintiff and Class members that the scheme participants would be improperly profiting from the force-placed insurance; and (d) misrepresenting to Plaintiff and Class Members that they were authorized to force-place high cost, unnecessary, and duplicative insurance in the manner described herein.

28.     Plaintiff herein asserts the following claims against AMIG and their subsidiaries and affiliates: (1) claims for aiding and abetting Sovereign's breach of fiduciary duty; (2) claims for engaging in unconscionable, deceptive and/or fraudulent business practices in violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq*.; and (3) State/common law claims for restitution/unjust enrichment and disgorgement and declaratory relief.

29.     In this action, Plaintiff does not challenge the rates of his force-placed hazard insurance as excessive.  Rather, Plaintiff challenges, among other things, and as further described herein, Defendants' *decision to purchase* force-placed hazard insurance from insurers that provide a financial benefit to Defendants and/or their affiliates and at prices that far exceed borrower-purchased hazard insurance (while providing substantially less coverage) and seek statutory and compensatory damages, as well as restitution/disgorgement for Defendants' unjust enrichment.

30.     In all respects, this conduct attributable to all Defendants herein is without justification, serving only to enrich Defendants at a significant cost to the borrowers who were required to purchase force-placed insurance.

## JURISDICTION AND VENUE

31.     This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").  Plaintiff and Defendants are citizens of different states, the amount in controversy in this action exceeds $5,000,000, and there are more than 100 members in the Classes.

32.     This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

33.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants Sovereign and AMIG maintain offices in Reading, PA and all Defendants regularly conduct business in Pennsylvania, and therefore reside in this district, and a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

Plaintiff Gerard Laffan

34.     Plaintiff Gerard Laffan currently resides in Hoboken, New Jersey.

35.     On or about September 27, 2011, Mr. Laffan obtained a $616,000 mortgage loan from Sovereign Bank, secured by his primary residence – a condominium unit at 720 Willow Ave, Unit 3, Hoboken, N.J., 07030.  *See* Exhibit 1, Gerard Laffan Mortgage.

## Defendants

36.     Defendant Sovereign with its home office in Wilmington, DE, is the principal bank subsidiary Santander Holdings USA, Inc. ("SHUSA"), headquartered in Boston, MA.

SHUSA is a wholly-owned subsidiary of Banco Santander, S.A. ("Santander"), headquartered in Spain.  At all relevant times herein Sovereign was registered to do business in the states of Pennsylvania and New Jersey and regularly conducts business in Pennsylvania, New Jersey and throughout the United States.

37.     SHUSA maintains several offices in Pennsylvania "which serve as the headquarters or house significant operational and administrative functions" including: the "Sovereign Bank Plaza Call Center and Operations and Loan Processing Center" at 405 Penn Street in Reading, Pennsylvania; the "Loan Processing Center" at 601 Penn Street, Reading, Pennsylvania; and the "Administrative Offices" at 1130 Berkshire Boulevard, Wyomissing, Pennsylvania.  *See* SHUSA 2012 10k.

38.     Communications from Sovereign to Mr. Laffan, including correspondence containing notice of the force-placed insurance policy were addressed from "Mortgage Servicing, Insurance Department" PO Box 12646, Reading, PA 19612.

39.     Defendant American Modern, a wholly owned subsidiary of Munich Re Group ("Munich Re"), is a provider of lender-placed mortgage hazard insurance, headquartered in Amelia, Ohio.  *See* http://www.amig.com/FinancialInstitutions.html (last accessed July 9, 2013). Munich Re is a foreign corporation headquartered in Germany.

40.     The "Insured" listed on Mr. Laffan's force-placed insurance policy is "Sovereign Bank ISAOA ATIMA, PO BOX 628, Amelia, OH 45102."  *See* Exhibit 10.  Laffan AMIG FPI Policy.

41.     The Financial Institutions Division of American Modern is the division which deals with the force-placement of borrower's homeowner's insurance, including specifically, hazard insurance.  *See* http://fid.amig.com/ (last accessed July 9, 2013).

42.     According to the Munich Re 2012 Annual Report, Exhibit 11, at 134, "agents appointed by [American Modern] for its Financial Institutions Division had been quoting and charging insureds rates that were partly under but predominately over the rates approved by the regulators . . . [American Modern] has self-reported the rate variances to its responsible insurance supervisor in Ohio and is working with them on a Corrective Action Plan."

43.     Defendant Atlas, a subsidiary of American Modern, maintains an office in Reading, PA.  *See* Laffan AMIG Insurance Policy, Exhibit 10, reflecting an address of 450 Penn Street, Reading, PA 19602.

44.     The insurance policies that were forced placed by Sovereign through AMIG named the lender or servicer as the named insured under the force-placed policies and did not include the borrower as a named insured.

## FACTUAL ALLEGATIONS

### Defendants Abused Force-Placed Insurance Mortgage Clauses to Generate Hidden and Unearned Profits

45.     On information and belief, Sovereign and AMIG have entered into contracts relating to all aspects of the force-placement of hazard insurance for borrowers whose loans are serviced by Sovereign.

46.     Each loan serviced by Sovereign is secured by a mortgage or deed of trust on the underlying property.

47.     In order to ensure that the mortgagee's interest in the secured property is protected, mortgage loan contracts typically allow the lender or third-party servicer discretion to "force-place" insurance when the homeowner fails to maintain the insurance.  Plaintiff's and Class members' mortgage loan contracts contain such provisions affording Sovereign the authority to force-place insurance in the event of a lapse.  The failure of a borrower to maintain

hazard insurance was clearly contemplated by the mortgage contract and such a failure by the borrower does not result in a material failure to perform under the mortgage contract.

48.     In the case of condominiums, like Mr. Laffan's, the mortgage loan contract typically contains a "Condominium Rider" which specifies that "Borrower's obligation… to maintain property insurance coverage on the Property is deemed satisfied ***to the extent that the required coverage is provided by the Owners Association policy***."   *See* Standard Fannie Mae/Freddie Mac Condominium Rider, attached hereto as Exhibit 12.

49.     Here, in addition to the hazard coverage provided by the Owners Association, Sovereign requires borrowers to maintain full hazard coverage, including Dwelling coverage not provided by the Owners Association.  This requirement is no different than the requirement applicable to mortgage borrowers with single family homes and the dwelling coverage required on Mr. Laffan's property no more covers personal property than dwelling coverage on a standard hazard insurance policy.

50.     The discretion afforded Defendants, however, to force-place insurance is limited by the bounds of reasonable conduct and by the express terms of the mortgage itself.  Sovereign routinely exceeds the bounds of reasonableness and the spirit, intent and letter of the mortgage contract by force-placing insurance and charging for it in a manner and in amounts that are not required to protect the lender's interest in the property in an effort to reap profits from the borrower which are not required nor contemplated by the mortgage contract and through other conduct described herein with respect to the force placement of insurance.  The typical mortgage contract does not disclose that the lender or other servicer will receive a financial benefit in connection with the force-placed insurance policy. Instead, the contract limits the authority of the

14

mortgage servicer to force-place insurance sufficient to protect the lender's interest in the secured property.  *See, e.g.*, Exhibit 1, at ¶ 9.

51.     These lender-placed or "force-placed" insurance policies are almost always more expensive than standard insurance coverage, as evidenced by Plaintiff's policies.  Such policies can cost as much as ten times more than standard policies.  *See* NYDFS March 21, 2013 Press Release.

52.     While the force-placed insurance policy is for the benefit of the lender, the cost for it, including the improper charges complained of herein, are passed on to the borrower.  *Id.*

53.     Once a lender and/or servicer receives evidence that a borrower has obtained his/her own insurance policy, the forced placed coverage should be fully or partially canceled.

<u>Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged
Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers</u>

54.     The force-placement of insurance policies is a very lucrative business for servicers and insurance carriers.  Here, Sovereign force-placed Plaintiff's insurance with AMIG in accordance with a pre-arranged agreement and in such a way as to receive and maximize its financial benefit.   Sovereign benefited because it placed Plaintiff's force-placed insurance policies with AMIG, which had already agreed to share revenue with Sovereign in the form of a direct commission payment and below cost tracking services.  Indeed, as Birny Birnbaum of the Center for Economic Justice, another experienced and noted expert in the area of force-placed insurance stated:

> [s]ervicers have financial incentives to force-place the insurance because the premiums include commissions and other considerations for the servicer.  With some servicers, the insurance is reinsured through captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement coverage.

*See* Birnbaum NYDFS Testimony at 15.

55.     Sovereign and AMIG profited from the ability to exploit their authority to force-place insurance in several ways, including through commission arrangements as depicted in the following graphic from *American Banker*:



Defendants' Profit Making Commission Arrangements

56.     Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the servicer or to a subsidiary posing as an insurance "agent."  Typically, under such an arrangement, commissions are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider.

57.     Moreover, "[t]he evidence from the [NYDFS] Investigation indicates that the affiliated agencies and brokers do little or no work for the commissions American Modern pays them."  NYDFS Consent Order at 5.

58.     American Modern agreed to cease paying these commissions in the NYDFS Consent Order.  *See* NYDFS Consent Order at 9.

59.     J. Robert Hunter of the Consumer Federation described these practices in his testimony before the NYDFS in connection with the Department's inquiry into force-placed insurance practices:

> [i]n some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or broker or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-affiliated captive reinsurers. Lenders often receive free or below cost service from affiliated service providers.

*See* Hunter NYDFS Testimony at 1.

### Sovereign Improperly Passed on Servicing Costs to Borrowers Who Were Required to Pay for Force-Placed Insurance

60.     Sovereign coordinated with AMIG to perform its servicing functions.  In so doing, Sovereign transferred the cost of servicing to AMIG.  As a result, these servicing costs were included in the force-placed insurance premiums paid by Plaintiff and Class members. Because AMIG was returning a large percentage of the borrowers' premiums to Sovereign, this arrangement functioned as an undisclosed kickback to Sovereign.

61.     Industry insiders acknowledge that force-placed insurance premiums are "a lot more expensive than other alternatives" because the administrative costs "are bundled into the costs of the premium."  *See* Testimony of Joseph Marcowicz (PRP Claims), Public Hearing on Private Lender-Placed Insurance, Property and Casualty Insurance (C) Committee Market Regulation and Consumer Affairs (D) Committee, National Association of Insurance

Commissioners, August 9, 2012, ("Markowicz Testimony") attached as Exhibit 13.   Mr. Markowicz also confirmed that administrative costs "tend to keep premium costs high" because expenses "which include the administrative work of the letter campaigns and tracking services provided to the loan servicer" are bundled into the premium." *Id.*   In effect, AMIG is providing below cost administrative services to servicers like Sovereign, and recouping those costs from borrowers whose insurance is force-placed.   Through this arrangement, Sovereign receives a kickback each time it places force-placed insurance with its exclusive, high-priced provider, AMIG.  In turn, AMIG also receives a kickback in the form of payment of such monitoring and tracking costs, as these costs are unnecessarily billed to force-placed borrowers.

62.     The NYDFS recognized that this practice has resulted in inflated premiums.  The NYDFS Consent Order bans this practice in the future with respect to American Modern's force-placed policies provided for borrowers in New York.  *See* NYDFS Consent Order at 9.

Defendants' Cannot Justify the High Cost of Force-Placed Insurance

63.     Servicer explanations for the high cost of force-placed insurance are "unsupported by any evidence." *See* Birnbaum NYDFS Testimony at 1.

64.     Servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting.  *Id.*

65.     Force-placed insurance policies are not underwritten on an individual policy basis.  Rather, servicers' contracts with force-placed insurance providers require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

66.     As J. Robert Hunter in his recent testimony before the NYDFS argued, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance."  *See* Hunter NYDFS Testimony at 5.  Yet it does not.  Instead, as a result of the arrangements between those participating in monitoring, placing and administering force-placed insurance, consumers are gouged.

67.     Force-placed insurer subsidiaries are highly profitable businesses.  "Among a published ranking of companies with the strongest operating insurance subsidiaries, several bank holding companies stand out . . . . Companies with insurance subsidiaries providing force-placed property insurance were at the top of the list."  *See* http://www.mainstreet.com/print/18604 (last visited July 9, 2013).  Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting.  However, as *American Banker* noted:

> [t]hough part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand.

*See* Ties to Insurers.

68.     Birny Birnbaum, in his testimony before the NYDFS, also presented statistics collected by the NAIC reflecting nationwide loss ratios for LPI hazard insurance during the 2004-2011 period as being, on average, more than 35 percentage points lower than the ratios for commercially available homeowners policies.  *See* Birnbaum NYDFS Testimony at 9.  When confined to the period from 2007-2011, the disparity between LPI hazard insurance loss ratios and those of commercially available homeowners policies was nearly 42 percentage points.  *Id.*

69.     Moreover, because the policies are not individually underwritten, the force-placed insurer is spared the costs associated with individual underwriting which should actually decrease the cost of insurance.   *See* Birnbaum NYDFS Testimony at 26.

As Servicer, Sovereign's Interest In The Force-Placed Insurance Is The Kickbacks, Commissions And Fees It Receives

70.     Although it may appear that servicers such as Sovereign force-place hazard insurance on mortgaged properties to protect against their risk of losing any amounts in the event of damage to the collateral, such "risk" is illusory.

71.     While lenders originate mortgages, these mortgages are frequently packaged into securities and sold to investors.  Thereafter, a servicing affiliate of the originating lender often continues to service those mortgages for a fee on behalf of the purchaser of the mortgages, often Fannie Mae or Freddie Mac, but neither the originating lender nor its servicing affiliate bears the risk that the mortgagees will default on the loan or that the collateral on the loan will become impaired.  Rather, that risk is borne by the borrower and/or the current lender/owner of the loan.

72.     Such servicers, including Sovereign, thus receive kickbacks and commissions for force-placed insurance policies at the expense of their customers, but with no risk to their own "investment."

Defendants Routinely Require Redundant or Otherwise Unnecessary Insurance

73.     Sovereign has routinely required borrowers to pay for unnecessary insurance coverage through AMIG.  Such examples include, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no risk of loss exists

for such period; and (c) passing on charges to borrowers who are force-placed that are unrelated to the provision of force-placed insurance.

74. Force-placed hazard insurance policies should not be backdated. The National Association of Insurance Commissioners ("NAIC") has indicated that insurance is "prospective in nature." Requiring borrowers to pay for backdated insurance coverage to cover time periods during which there is already no risk of loss is improper. *See, e.g*., Ties to Insurers ("'[Insurance policies] should not be back-dated to collect premiums for a time period that has already passed'" (quoting the NAIC)).

75. Moreover, many hazard insurance policies contain a Lender's Loss Payable Endorsement. This endorsement typically protects the lender for a period of at least ten days after the termination of the insurance policy. Accordingly, force-placing insurance policies effective immediately following the termination of the borrower's policy and charging borrowers expensive premiums for such insurance is unlawful and unfair because borrowers are charged for needless and duplicative insurance coverage.

<u>Defendants' Practices Improperly Inflate Charges to Borrowers for Force-Placed
Insurance Charges to Borrowers</u>

76. By retaining a commission or participating in a captive reinsurance arrangement, the servicer forces the borrower to pay for both the actual cost of the insurance policy and the cost of the kickback. As American Banker observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." *See* Ties to Insurers; *See also* NYDFS March 21, 2013 Press Release at 2. These costs are ultimately paid by the borrowers and serve to unjustly enrich all Defendants, including those with whom the borrower has no contractual relationship, such as Defendants AMIG.

77.    Thus, Defendants' kickback arrangements with force-placed insurance providers tend to keep the amounts charged to borrowers for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders.  Amounts paid to servicers as commissions and subsidized portfolio tracking and monitoring services have become a part of the cost of doing business for force-placed insurance providers.  As a result, force-placed insurance premiums incorporate the payment of such kickbacks—to the detriment of consumers.

78.    AMIG plays a crucial role in the Defendants' force-placement activities as it admits in its filings, and as evidenced by its role in the NYDFS investigation which ultimately resulted in the entry of a Consent Order to which it was a party.

79.    Additionally**,** AMIG has acknowledged that, "agents appointed by [AMIG] for its Financial Institutions Division [responsible for force placed mortgage hazard insurance] had been quoting and charging insureds rates that were partly under but predominately over the rates approved by the regulators…  [AMIG] has self-reported the rate variances to its responsible insurance supervisor in Ohio and is working with them on a Corrective Action Plan." *See* Munich Re 2012 Annual Report, Exhibit 11, at 134.

80.    Moreover, upon information and belief, AMIG also provided portfolio monitoring and tracking services to Sovereign at below market rates – effectively providing kickbacks to Sovereign in the form of subsidies paid by force-placed borrowers.  The small percentage of borrowers who paid for force-placed insurance shouldered the costs of monitoring Sovereign's entire loan portfolio.  AMIG is additionally able to profit through this arrangement by collecting payments for such services that would otherwise not be separately charged to Borrowers.

81.     As discussed in greater detail below, on March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") after observing that the existing force-placed insurance system "may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms."   *See* Fannie Mae Request For Proposal dated March 6, 2012 attached as Exhibit 14.   The RFP further noted that, in addition to payment of unnecessary commissions/fees, "Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie May pays to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs of tracking services."   *Id.*

Mr. Laffan's Force-Placed Insurance Policy

82.     Prior to being force-placed, Mr. Laffan maintained hazard insurance on the property at 720 Willow Ave, Unit 3, Hoboken, N.J., 07030 through FMI Insurance Company.

83.     The FMI Policy provided "Interior Dwelling" coverage not provided by the condominium owners association in the amount of $160,000, and additionally provided personal liability coverage in the amount of $1,000,000 per occurrence, loss of use coverage in the amount of $64,000 and other coverage.   *See* Evidence of Property Insurance ("FMI Policy"), attached hereto as Exhibit 15.

84.     "Interior Dwelling" coverage is no different than dwelling coverage on a hazard policy for a single family home but is limited to the interior, while "exterior" hazard coverage is provided by the owners association pursuant to its master policy.   Pursuant to a standard "Condominium Rider", Sovereign requires borrowers to maintain insurance for hazards not covered under the owners association master policy.

85.     On or about September 19, 2012, Mr. Laffan's FMI Policy lapsed.  The cost to renew the policy for the FMI Policy for the period September 19, 2012 to September 19, 2013 was $633.  *See* Insurance Notice, attached hereto as Exhibit 16.

86.     On or about October 19, 2012, Mr. Laffan received notice that his policy had lapsed on October 9, 2012 and that Sovereign would place insurance if he failed to provide evidence of insurance.  *See* Sovereign Correspondence, attached hereto as Exhibit 17.

87.     On or about January 1, 2013, Sovereign force placed a hazard insurance policy, purportedly through American Modern's affiliate Atlas acting as an agent, providing dwelling coverage in the amount of $160,000 through American Modern, backdated to October 19, 2012, with an annual premium of $1,360.00.  *See* Exhibit 10, AMIG Policy.

88.     The AMIG Policy was backdated to October 9, 2012, despite the fact that there was no damage to the property or claims arising out of the property for the lapse period.

89.     Subsequently, Mr. Laffan obtained coverage through Great Northern Insurance Company, providing Dwelling coverage in the amount of $130,000 for the annual period beginning April 24, 2013, and included Personal Property Coverage in the amount of $50,000, liability coverage in the amount of $1,000,000 and "Unlimited" loss of use coverage (the "Great Northern Policy").  *See* Evidence of Property Insurance ("Great Northern Policy"), attached hereto as Exhibit 18.  The annual premium for the Great Northern Policy was $696.19.  *See* Personal Insurance Statement, New Policy, attached hereto as Exhibit 19.

90.     Notably, while the annual premium for the force-placed AMIG Policy was nearly double the amount of the Great Northern Policy premium, the AMIG Policy provided substantially less coverage, in that it covered only the structure of the home (and nothing else). At the same time, the AMIG Policy coverage in the amount of $160,000 for the structure was

more than required to protect the lender's interest in the property.  Indeed, the subsequent Great Northern Policy, accepted by Sovereign, only covered $130,000.  *See* Exhibit 18.

91.     After he obtained the Great Northern Policy, Mr. Laffan received a letter indicating that the AMIG Policy was canceled effective April 24, 2013.  However, Defendants charged Mr. Laffan for force-placed insurance covering the period October 9, 2012 (date the FMI Policy expired) to April 24, 2013 (date the Great Northern Policy began).  *See* Sovereign Correspondence dated April 30, 2013, (reflecting an escrow advance charge of $734), attached hereto as Exhibit 20.  Sovereign also added $61.17 to Mr. Laffan's monthly mortgage payments, effective June 30, 2013, for repayment of the AMIG Policy from the escrow account.  *Id.*

Government Response

92.     As discussed above, force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government investigations prompted by concerns that consumers are being gouged when they are force-placed in insurance following a lapse in their policies.

93.     Thus, state attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning force-placed insurance.  Recently, a coalition of forty-nine (49) state attorneys general entered into an historic joint state-federal settlement agreement with the country's five largest loan servicers ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis.  *See* www.nationalmortgagesettlement.com/ (official website established by the government relating to the settlement);  *see also* Jeff Horowitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, American Banker (Mar. 10, 2011, 12:25 PM),

http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-1.html (last visited July 9, 2013).

94.     Among other terms, the settlement essentially prohibits servicers from profiting from force-placed insurance.  Specifically, under the settlement, mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed insurance at a commercially reasonable price.  *See* Consent Judgment, *United States of America v. Bank of America Corp.*, No. 1:12-cv-00361-RMC (D.D.C. Apr. 14, 2012) (ECF No. 14 Section VII).

95.     The Consumer Financial Protection Bureau issued two notices on proposed rules "to protect homeowners from surprises and costly mistakes by their mortgage servicers," which included specific provisions for "avoiding costly force-placed insurance."  *See* Consumer Financial Protection Bureau Proposes Rules to Protect Mortgage Borrowers" available at http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers/ (last visited July 9, 2013).

96.     These rules became final on January 17, 2013.  The new regulations prohibit servicers of federally regulated mortgage loans from force-placing insurance unless a servicer has a reasonable basis to believe that the borrowers insurance has lapsed.  Servicers must provide notice of force-placement three times at 45, 30 and 15 days in advance of issuing a policy.  Moreover the charge for any service that was actually performed must "bear a reasonable

relationship to the servicers cost of providing the service.  A servicer cannot force-place insurance if the borrower has an existing escrow account if the servicer can continue the existing insurance, even if the servicer must advance the funds for the insurance."  *See* Summary of Final Mortgage Servicing Rules dated January 17, 2013 available at http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-proposes-rules-to-protect-mortgage-borrowers (last visited July 9, 2013). *See also*, 12 CFR 1024.

97.     In its March 6, 2012 RFP, Fannie Mae stated that it had conducted an "extensive internal review" of the lender-placed insurance process, and found that the process "can be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners."  In particular, Fannie Mae made the following observations:

☐     "Lender Placed Insurers often pay commissions/fees to Servicers for placing business with them.  The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums[.]"

☐     "The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms . . . . Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down."

☐     "[M]uch of the current lender placed insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner."

*See*, Fannie Mae RFP, Exhibit 14.

98.     Fannie Mae stated that it sought to "[r]estructure the business model to align Servicer incentives with the best interest of Fannie Mae and homeowners."  Among other things, Fannie Mae sought to "[e]liminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae" and to "[s]eparate the commissions and fees for Insurance

Tracking Services from the fees for Lender Placed Insurance to ensure transparency and accountability." *Id.* at 3.

99.     On March 25, 2013, the Federal Housing Finance Agency ("FHFA") issued a Notice regarding Lender Placed Insurance.  This Notice "sets forth an approach to address certain practices relating to lender placed insurance that the [FHFA] considers contrary to prudent business practices [and] to appropriate administration of Fannie Mae and Freddie Mac (the Enterprises) guaranteed loans," and which result in "litigation and reputational risks."  *See* Federal Housing Finance Agency, No. 2013-05 Lender Placed Insurance, Terms and Conditions attached as Exhibit 21.

100.    FHFA prohibits:

> Certain Sales Commissions.  The Enterprises shall prohibit sellers and servicers from receiving, directly or indirectly, remuneration associated with placing coverage with or maintaining placement with particular insurance providers.

101.    The FHFA acknowledged:

> ☐     "Reportedly, premiums for lender placed insurance are generally double those for voluntary insurance and, in certain instances, significantly higher."  *Id*. at 2.

> ☐     "[T]he multiples involved may not reflect claims experience..."  *Id*.

> ☐     "Loss ratios for lender placed insurance are significantly below those for voluntary hazard insurance and some states have required or have considered rate reductions of 30 percent or more."  *Id*.

> ☐     "Concerns about lender placed insurance costs, compensation and practices have been raised by the National Association of Insurance Commissioners, state regulators, the Consumer Financial Protection Bureau, state attorneys general and consumer organizations.  Generally, the focus has centered on excessive rates and costs passed on to borrowers, as well as commissions and other

compensation paid to servicers by carriers. In order to keep lender placed insurance costs to the Enterprises as low as possible, practices that provide incentives for and do not deter higher costs should be avoided." *Id*. at 3.

## CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and

23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Classes:

> a nationwide class consisting of all persons who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit with Sovereign and had hazard insurance force-placed upon the secured property by Sovereign ("Nationwide Class");

> a New Jersey subclass consisting of all persons who, within the applicable statute of limitations, have or had a residential mortgage loan or line of credit with Sovereign secured by property located in the State of New Jersey and had hazard insurance force-placed upon the secured property by Sovereign (the "New Jersey Subclass");

103.    The Classes exclude Defendants and any entity in which Defendants have a

controlling interest, and their officers, directors, legal representatives, successors and assigns.

The Classes also exclude government entities and judicial officers that have any role in

adjudicating this matter.

104.    The Classes are so numerous that joinder of all members is impracticable.

105.    A Class action is superior to all other available methods for the fair and efficient

adjudication of this controversy.

106.    Plaintiff's claims are typical of the claims of the Classes.

107.    There are questions of law and fact common to the Classes, including but not

limited to:

- The nature, scope and implementation of Defendants' unlawful, improper and fraudulent acts;

- Whether Defendants misrepresented the reason for the high cost of force-placed insurance;

- Whether Defendants misrepresented that the Plaintiff's and Class members mortgage contracts authorized them to force-place insurance in the manner they did;

- Whether Defendants fraudulently concealed their scheme;

- Whether Defendants maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

- Whether Sovereign maintained a policy of referring force-placed insurance business to AMIG;

- Whether Sovereign breached the terms of Plaintiff's and Class members' mortgages or loan contracts;

- Whether Defendants maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements;

- Whether Defendants received commission payments from force-placed insurance providers;

- Whether Defendants' force-placed insurance policies were provided by an affiliated entity;

- Whether Defendants or their affiliates participated in arrangements that involved kickbacks;

- Whether Defendants received financial benefits from the force-placed insurance provider in the form of insurance monitoring, tracking and processing services;

- Whether Defendants received unauthorized and illicit payments in connection with force-placed insurance that were unrelated to a *bona fide* service in connection with the force-placed insurance and its purpose;

- Whether Defendants received payments in connection with force-placed insurance that exceeded the value of any services actually performed or that were otherwise commercially unreasonable;

- Whether Defendants wrongfully backdated force-placed insurance policies;

- Whether Defendants required unnecessary or duplicative force-placed insurance;

- Whether Defendants violated their implied covenant of good faith and fair dealing;

- Whether Defendants breached the implied covenant of good faith and fair dealing in Plaintiff's and Class Members' mortgages or loan contracts;

- Whether Defendants breached the terms of Plaintiff's and Class members' mortgages or loan contracts;

- Whether Defendants engaged in unconscionable, deceptive and/or fraudulent business practices in violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.*;

- Whether Sovereign breached its fiduciary duty to Plaintiff and members of the Class;

- Whether AMIG, induced and/or participated in Sovereign's breach of fiduciary duties;

- Whether Defendants have been unjustly enriched; and

- Whether Defendants are liable to Plaintiff and the Classes for damages and, if so, the measure of such damages.

108.    These and other questions of law and/or fact are common to the Classes and predominate over any questions affecting only individual Class members.

109.    The same common issues predominate with respect to all Class members, regardless of whether their loans were originated by or merely serviced by Defendants.

110.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Classes.  Plaintiff has no claims antagonistic to those of the Class.  Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.   Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

111.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of

31

inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

112.   Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Classes would create a risk of adjudication with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

113.   Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

114.   Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

CLAIMS FOR RELIEF

COUNT ONE

Breach of Contract

(Breach of the Implied Covenant of Good Faith
and Fair Dealing On Behalf of the Nationwide Class and State Subclass Against Defendant
Sovereign)

115.   Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

116.   Every contract contains an implied covenant of good faith and fair dealing.

117.   The mortgage contracts of Plaintiff and the other Class members contained an implied covenant of good faith and fair dealing, pursuant to which Sovereign was bound to perform its obligations in good faith and to deal fairly with Plaintiff and the other Class members.

118.   To the extent that the mortgage contracts of Plaintiff and the Class members permitted Sovereign to unilaterally "force-place" insurance, Sovereign was obligated not to exercise its discretion capriciously or in bad faith (for its own financial gain for the purposes of maximizing profits at borrowers' expense).

119.   Sovereign breached its duties of good faith and fair dealing in at least the following respects, among others:

- Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead—for the sole purpose of maximizing its own profits—forcing borrowers to pay for insurance policies from providers chosen by Sovereign.  These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

- Using its discretion to choose a force-placed insurance provider and a policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for both (i) the actual cost of protecting the mortgagee's interest in the property and (ii) the cost of the commissions Sovereign accepted from the force-placed insurance provider;

- Failing to seek competitive bids on the open market or otherwise making good faith efforts to reasonably exercise its discretion and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased at excessive costs through the same companies in order to produce additional profits for Defendants;

- Assessing excessive, unreasonable, and unnecessary insurance policy charges against Plaintiff and the Classes while misrepresenting the reason for the cost of the policies;

- Collecting a percentage of the force-placed premiums charged to Plaintiff and the Class, thereby creating the incentive to seek the highest-priced premiums possible;

- Accepting commissions in return for placing borrowers with force-placed insurance providers, despite the fact that Defendants actually incur little, if any, expense because the force-placed insurance policies are automatically issued pursuant to pre-arranged agreements with providers;

- Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

- Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time; and

- Failing to provide borrowers with any opportunity to opt out of having their force-placed insurance policies provided by an insurer with whom Defendants had a commission and/or captive reinsurance arrangement.

120. As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the other Class members have suffered damages.

121. Plaintiff and the other Class members have been damaged as a direct and proximate result of Defendants' breach and are entitled to damages.

## COUNT TWO

### Breach of Contract

#### (On Behalf of the Nationwide Class and State Subclass Against Defendant Sovereign)

122. Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

123. Sovereign has serviced loans evidenced by substantially similar standard form notes and mortgage contracts.

124.    To the extent that the mortgage contracts of Plaintiff and the Classes permitted Sovereign to unilaterally "force-place" insurance, Sovereign was contractually obligated to exercise their discretion in compliance with the terms of mortgage agreements.

125.    Section 9 of Plaintiff's mortgage agreement explicitly provides that if the borrower fails to perform any of the covenants and agreements contained in the mortgage agreement, the "Lender may do and pay for whatever is reasonable or appropriate to protect the Lender's interest in the property." *See* Exhibit 1, Laffan Mortgage, ¶ 9.

126.    Upon information and belief, all residential mortgages and/or lines of credit serviced by Sovereign contained materially similar language or identical language.

127.    Nonetheless, Sovereign has imposed or collected amounts that exceeded the amounts reasonable, appropriate and/or necessary to protect the mortgagee's interest in the policy.  Such practices have included, without limitation: (a) requiring borrowers to pay amounts that exceed the cost of insuring the property but instead constitute kickbacks between Defendants that are charged to borrowers; and (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no loss occurred during the lapsed period; and (c) requiring borrowers to pay for force-placed insurance coverage greater than what is required to protect the lender's interest in the property.

128.    Sovereign has thus breached the mortgage contracts of Plaintiff and the other Class members.

129.    Plaintiff and the other Class members have been damaged as a direct and proximate result of Sovereign's breach and are entitled to damages.

COUNT THREE

BREACH OF FIDUCIARY DUTY/MISAPPROPRIATION
OF FUNDS HELD IN TRUST

(On Behalf of the Nationwide Class and State Subclass Against Defendant Sovereign)

130.     Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

131.     Sovereign holds and/or controls funds in escrow; controls the establishment, funding requirements and maintenance of escrow accounts for the purposes of paying insurance premiums and other items set forth in borrowers' mortgages, *see* Exhibit 1 at ¶ 3 and Exhibit 20, and is obligated under the mortgages to return any excess funds in accordance with the terms of the mortgages.

132.     Sovereign was obliged to hold, manage and control any escrow funds in trust, and owes Plaintiff and members of the Classes the highest fiduciary duty with respect to the handling of such funds.

133.     Sovereign breached its fiduciary duty to Plaintiff and the members of the Classes by, *inter alia*: (a) unilaterally using escrow funds to purchase force-placed insurance at a cost and in amounts that were inflated solely in order to generate additional profits for Defendants; (b) profiting from unnecessary and excessive force-placed insurance policies that were purchased from escrow funds at the expense of Plaintiff and the Class members; (c) unilaterally utilizing the escrow funds to pay for unnecessary and duplicative insurance for purposes of increasing Defendants' profits; and (d) improperly depleting the escrow funds (including assessing negative balances) for unnecessary, unauthorized and duplicative hazard insurance resulting in additional costs and injury to Plaintiff and members of the Class.

36

134.    These actions were undertaken by Sovereign in bad faith solely for the benefit of Defendants and were not intended to benefit Plaintiff or other borrowers.

135.    As a direct result of Sovereign's actions and subversion of Plaintiff's interest to Defendants' own interests in reaping additional, extravagant and unauthorized fees and profits, Plaintiff and the Classes have suffered injuries in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

136.    Plaintiff and members of the Classes are entitled to all damages resulting from Sovereign's breach of its fiduciary obligations and misappropriation of escrow funds.   In addition, Plaintiff and members of the Classes are entitled to punitive damages because Sovereign acted in bad faith in deliberate and/or reckless disregard of their rights and Sovereign's obligation to hold their escrow funds in trust.

## COUNT FOUR

## AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY

(On Behalf of the Nationwide Class
and State Subclass Against AMIG)

137.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

138.    Sovereign breached its fiduciary duties to Plaintiff and the Classes as set forth herein above, including specifically as set forth in Count Three.

139.    AMIG actively induced and/or participated in Sovereign's breach of fiduciary duties through the conduct described herein, including, but not limited to, offering Sovereign the opportunity to reap additional profits through a scheme to force-place borrowers serviced by

Sovereign in unnecessary, duplicative and exorbitantly priced force-placed insurance and tracking services sold by AMIG and its affiliates in exchange for kickbacks, sham commissions, fees for sham services and "rebates" paid to Sovereign - the cost of which were wrongfully impose on borrowers.

140.    AMIG and its affiliates actively induced and/or participated in Sovereign's breach of fiduciary duties through the provision of tracking services that identified and implemented the force-placement of Plaintiff and Class members in unnecessary, duplicative and exorbitantly priced hazard insurance and facilitated the billing and payment for such insurance.

141.    AMIG induced and/or participated in Sovereign's breach of fiduciary duties through the facilitation of Sovereign's scheme by participating in the selection of Sovereign's exclusive force-placed insurance provider.  Further, AMIG was involved in the preparing and/or sending of information to borrowers facing force-placement which were misleading and contained material omissions designed to lull borrowers into a sense that while the insurance being force-placed was more expensive, the placement of such insurance was still reasonable under the mortgage and in the insurance industry.

142.    As a result of the breach of fiduciary duties to Plaintiff and members of the Classes by Sovereign that AMIG induced and/or participated in with full knowledge as herein described, Plaintiff and members of the Classes suffered damages in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

143.    Plaintiff and the Classes are entitled to all damages resulting from Sovereign's breach of their fiduciary obligations and misappropriation of escrow funds.  AMIG is liable for these damages by virtue of AMIG's aiding and abetting Sovereign's conduct.

COUNT FIVE

Violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, et seq.

(Against Sovereign on Behalf of the State Subclass)

144.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

145.    Plaintiff brings this claim for relief on behalf of himself and the members of the New Jersey Class pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8 1, *et seq.* ("the Act").

146.    Plaintiff, New Jersey Class members, and Defendants are "persons" within the meaning of the Act.

147.    Plaintiff and all other members of the New Jersey Class were improperly charged by Defendants and paid for force-placed insurance, and thereby suffered ascertainable losses of money as a result of the use and employment by Defendants, within the State of New Jersey, of methods, acts and practices prohibited by the Act.

148.    Defendants' prohibited practices included the following:

(a) Failing to make any effort to maintain borrowers' existing insurance policies and, instead, for the sole purpose of maximizing their own financial gain, purchasing and charging borrowers for force-placed insurance policies from providers of Defendants' choice, such as AMIG. These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

(b) Choosing a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for more than the cost of protecting the lender's interest in the secured property;

(c) Selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased through the same companies;

(d) Assessing excessive, unreasonable and unnecessary insurance policy premiums against Plaintiff and the New Jersey Class and misrepresenting the reason for the cost of the policies;

(e) Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

(f) Misrepresenting in force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time;

(g) Failing to provide borrowers with any opportunity to opt out of having their force-placed insurance policies provided by an insurer with whom Defendant had a kickback arrangement;

(h) Misrepresenting that the charges imposed for force-placed insurance were to protect the borrowers' and Defendants' "mutual interests in the property" and that any portions of the premiums returned to Defendants were for expenses incurred in connection with forced-placing insurance; and

(i) Engaging in other unfair or unlawful conduct as described in this Complaint.

147. The above described conduct constitutes an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation and/or the knowing

concealment, suppression, and omission of a material fact with intent that others rely thereupon, prohibited by and in contravention of N.J.S.A. § 56:8-2.

149.    Defendants' unconscionable and prohibited practices have caused Plaintiff and the other members of the New Jersey Class to suffer ascertainable loss, thereby entitling them to bring this action pursuant to N.J.S.A. § 56:8-19.

COUNT SIX

Unjust Enrichment/Disgorgement

(On Behalf of the Nationwide Class and State Subclass Against AMIG)

150.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

151.    Neither Plaintiff nor other Class Members entered into a contract with AMIG as a result of the imposition of force-placed insurance.  As a result of the explicit absence of a contractual relationship between Plaintiff/Class Members and AMIG there is no adequate remedy at law to compensate Plaintiff and Class Members for the money improperly taken from them and retained by AMIG through the scheme described herein.

152.    Plaintiff and the members of the Classes have conferred a substantial benefit upon AMIG which has been appreciated by AMIG.  During the Class Period, AMIG wrongfully collected millions of dollars in unearned payments derived from the force-placed insurance premiums paid by Plaintiff and the putative Class members.

153.    Plaintiff and Class Members were required to pay amounts charged for unnecessary, backdated and/or excessive force-placed insurance pursuant to a scheme designed and perpetrated between Defendants described herein.

154.    Upon information and belief, AMIG performed portfolio monitoring and tracking services at below market rates for Sovereign – effectively providing kickbacks to Sovereign in the form of subsidies paid by force-placed borrowers.

155.    Additionally, as AMIG has acknowledged in public filings, "agents appointed by [AMIG] for its Financial Institutions Division [responsible for force placed mortgage hazard insurance] had been quoting and charging insureds rates that were partly under but predominately over the rates approved by the regulator." *See* Munich Re 2012 Annual Report, Exhibit 11, at 134. Upon information and belief, these amounts were passed on to borrowers.

156.    These payments were accepted and retained by AMIG under circumstances such that it would be inequitable for AMIG to retain the benefit without payment to Plaintiff and the members of the Class.

157.    As a result of AMIG's unjust enrichment, Plaintiff and members of the respective Classes have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of AMIG's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

158.    Plaintiff and members of the Classes also seek restitution and disgorgement of profits realized by AMIG as a result of their unfair, unlawful and/or deceptive practices.

159.    Defendants entered into an agreement where AMIG would provide force-placed insurance policies to Sovereign. Sovereign would subsequently charge Plaintiff and members of the Classes amounts that included not just the cost to insure the properties, but also included the costs of the kickbacks between defendants. AMIG knew that the charges to borrowers were excessive and not the result of good faith practices.

160.     AMIG paid significant monies in illegal kickbacks, commissions, and referral fees directly to Sovereign in order to be able to exclusively provide force-placed insurance policies and stifle competition with full knowledge that such amounts would ultimately and improperly be charged to the force-placed borrower.

161.     Further, Plaintiff and the Classes, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Defendants as a result of AMIG's unfair, unlawful and/or deceptive practices.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Classes and award the following relief:

A.     That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as representative of the Classes and Plaintiff's counsel as counsel for the Classes;

B.     That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

D.     Compensatory, consequential, and general damages in an amount to be determined at trial;

E.     Costs and disbursements of the action;

F.     Restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Classes;

G.     Pre- and post-judgment interest;

H.     Reasonable attorneys' fees; and

I.     That Defendants be enjoined from the conduct challenged herein; and

J.     Such monetary, injunctive other relief to the subclass that is provided for by the

state statute;

K.     Punitive damages, and

L.     Such other and further relief as this Court may deem just and proper.

DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims in this action.


Dated:  July 11, 2013                         Respectfully submitted,


                                              JHM 6596_____
                                              **KESSLER TOPAZ MELTZER**
                                              **  & CHECK, LLP**
                                              Joseph H. Meltzer
                                              Edward W. Ciolko
                                              Peter A. Muhic
                                              Tyler S. Graden
                                              Shannon O. Braden
                                              280 King of Prussia Road
                                              Radnor, PA  19087
                                              Telephone: (610) 667-7706
                                              Facsimile: (610) 667-7056
                                              Email: jmeltzer@ktmc.com
                                              Email: eciolko@ktmc.com
                                              Email: pmuhic@ktmc.com
                                              Email: tgraden@ktmc.com
                                              Email: sbraden@ktmc.com


                                              **NIX PATTERSON & ROACH, LLP**
                                              Brad Seidel
                                              Christopher Johnson
                                              3600 North Capital of Texas Highway
                                               Building B, Suite 350
                                              Austin, TX  78746
                                              Telephone: (512) 328-5333
                                              Facsimile: (512) 328-5335
                                              Email: bseidel@npraustin.com
                                              Email: cjohnson@npraustin.com

**HOLLAND, GROVES, SCHNELLER & STOLZE, LLC**
Eric D. Holland
Gerard B. Schneller
300 N Tucker, Suite 801
St. Louis, Missouri 63101
Telephone: 314.241.8111
Facsimile: 314.241.5554
Email: eholland@allfela.com
Email: gschneller@allfela.com

*Attorneys for Plaintiff*